An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

NO. COA14-15

NORTH CAROLINA COURT OF APPEALS

Filed:  5 August 2014

STATE OF NORTH CAROLINA

v.

BRYAN RASHAD BUNN

Durham County
No. 12 CRS 52074

Appeal by defendant from judgments entered 12 July 2013 by Judge Paul C. Ridgeway in Durham County Superior Court.  Heard in the Court of Appeals 7 May 2014.

> *Attorney General Roy Cooper, by Assistant Attorney General Sarah Y. Meacham, for the State.*
>
> *Law Office of Margaret C. Lumsden PLLC, by Margaret C. Lumsden, for defendant-appellant.*

McCULLOUGH, Judge.

Defendant Bryan Rashad Bunn appeals his convictions of two counts of statutory sexual offense of a 13, 14, or 15 year old and two counts of indecent liberties with a child.  Based on the reasons stated herein, we find no prejudicial error.

## I.    Background

On 7 May 2012, defendant was indicted on the following charges: two counts of statutory sexual offense of a person who is 13, 14, or 15 years old in violation of N.C. Gen. Stat. § 14-27.7A; two counts of indecent liberties with a child in violation of N.C. Gen. Stat. § 14-202.1; one count of crime against nature in violation of N.C. Gen. Stat. § 14-177; and one count of contributing to the delinquency of a minor.

The State's evidence tended to show that Adam[1] was born on 24 January 1997 and resided with his mother in Chapel Hill, North Carolina. While Adam was a fourth grade student at Glenwood Elementary School, he met defendant through an after-school program where defendant served as a group leader. Over the course of several years, defendant and Adam developed a close relationship – defendant would take Adam home after school; defendant would pick up Adam at his mother's house and spend time at defendant's mother's house; defendant and Adam would go shopping and go out to eat together; and Adam would spend time at defendant's home, including overnight visits three to four times a week.

In the spring of 2010, when Adam was in the seventh grade, Adam took a trip with defendant and defendant's family to

---

[1]A pseudonym has been used to protect the identity of the minor victim.

Washington, D.C. Adam was thirteen years old at the time and defendant was twenty-seven years old. While in a hotel room, defendant and Adam shared a bed. Adam testified that he was partially asleep, when he felt defendant's mouth on his penis. He "didn't know what to do" and did not say anything. Defendant continued to perform oral sex on him for fifteen to twenty minutes. The night they returned to North Carolina from the trip, Adam spent the night at defendant's apartment. Adam testified that as he was lying on his right side, defendant was behind him and "stuck his penis in my anus[.]" During the summer of 2010, Adam stated that four to five times a week, defendant would perform "[o]ral and sometimes anal, and then sometimes, like, the hand."

Adam also testified that he saw a video of defendant masturbating on defendant's cell phone and a video of two males having sex on defendant's laptop. While defendant was away at work and Adam was alone in defendant's apartment, Adam found and watched a pornographic DVD.

Adam testified that he considered telling someone about these incidents but "knew it would be hard to tell them, but – I don't know, I had to get it off my chest." In September 2010,

Adam told his mother that defendant had been molesting him and Adam discontinued living with defendant.

Adam's mother testified that she met defendant through the after-school program offered at Adam's school. At first, defendant lived with his mother and then eventually got his own apartment in Durham, North Carolina. Defendant and Adam's relationship started by spending time together on Wednesdays while Adam's mother attended meetings. Once defendant obtained his own apartment, the amount of time spent between defendant and Adam increased. Defendant told Adam's mother that Adam would have his own room at defendant's apartment. Adam started having overnight visits with defendant and for all practical purposes, started living with defendant.

At some subsequent point in time, Adam told his mother, "I don't want to go back to stay the night at [defendant's] anymore[.]" Adam's mother testified that she told him he did not "have to go back." Adam's mother testified that she knew something was "really wrong" when one day, Adam refused to go to bed until defendant had left her house. Adam's mother asked Adam, "has [defendant] ever been inappropriate with you or did something wrong that you knew was wrong[?]" and Adam responded by saying, "mama, I don't want you to go to jail." Thereafter,

Adam's mother sent a text message to defendant stating the following: "you are in no way, shape, or form to contact my son again, whether it's e-mail, text message, telephone. I know what you did and I believe my son, and you're to stay away from us, and through therapy and stuff, you know, maybe we'll get through this." Defendant responded by calling Adam's mother multiple times and requesting to talk to her. Adam's mother testified that:

> [defendant] said I'm sorry[.] . . .
> [Defendant] said, he got into bed with me
> and I thought it was somebody else. And I
> said if you think that I have answered this
> phone to listen to you lie to me, that's not
> happening. I believe everything [Adam] said.

Adam's mother testified that in March 2011, defendant sent her a text message that read as follows:

> Hey, I know I'm probably the last person you
> want to hear from right now, but for some
> reason I feel that you still care for me
> deep down inside. I'm sorry about what
> happened and I guess I will have three
> months to think about all my wrongdoings.
> Please just -- please just know that ever
> since January 26th, I have . . . done one
> thing but think of you and [Adam] from the
> time I wake up in the morning until the time
> I rest my head. I still love you both -- I
> still love both of you guys to death and I
> will be praying that you will forgive me and
> accept – and accept me back as a changed
> person. I hate myself for what happened,
> but have asked for forgiveness and . . .
> that's all I can do at this point.

Natalie Hawkins, a licensed marriage and family therapist, testified that she met with defendant on 21 February 2011 and 2 March 2011 to conduct assessments for psychotherapy, family therapy services. During the assessments, Hawkins testified that defendant "was feeling distressed about a relationship he had with – he called him his mentee, and he was a boy who had been living with him" from March 2009 to September 2010. Defendant later identified his mentee as Adam. Hawkins testified that defendant "disclosed that it was something similar – behavior that was similar to what [defendant] had experienced himself when he was younger" and disclosed that "it was inappropriate and sexual in nature." Based on this information, Hawkins was obligated to report the possible abuse to the Department of Social Services.

Adam's father also testified for the State. Adam's father testified that Adam's behavior had changed to being scared to be alone, "he locks the door to the bedroom, you can't – he pulls all the blinds, he's scared, and especially at night. He has no social life, he don't [sic] know how to mingle with other people, he alienates himself."

Detective Ron Christie with the Durham County's Sheriff's Office testified that in a September 2011 interview with Adam,

Adam "described an oral -- an oral sexual relationship" with defendant while they were living together. Detective Christie conducted a follow-up interview of Adam in May 2012 and testified that the details Adam provided in the interview were consistent with the details Adam provided to the jury.

Janet Martin, a child protective services social worker with Orange County Social Services, testified that on 2 March 2011, she received a report that defendant "had disclosed that he had sexually abused a child who lived with him named [Adam]." Upon meeting with Adam, Adam disclosed that defendant had "messed with him," "it was kind of sexual," and "that it happened often[.]"

Defendant testified in his own defense. He met Adam during the 2005-2006 school year at Glenwood Elementary School where he served as an after-school group leader and teacher's assistant. Their relationship began with defendant giving Adam rides home from the after-school program. Every Wednesday, defendant would go to Adam's house and help him with homework while Adam's mother would attend meetings. Defendant would also take Adam to the shopping mall, to restaurants, and to play basketball with defendant's family.

Defendant testified that his motivation for developing a friendship with Adam was that he "noticed that [Adam] needed help. [Adam] was pretty much getting in trouble at [school] . . . and I knew that he would listen to me because he always was around me, as I was a group leader at [school.]" In March 2009, defendant moved into his own apartment and Adam moved in with him in May of that same year. Although Adam had his own room, defendant testified that Adam chose to sleep in defendant's room because "he was afraid of the dark[.]"

In August 2009, defendant took Adam on a trip to Washington, D.C. Defendant denied touching Adam inappropriately and waking Adam up with inappropriate sexual contact on the first night of the trip to Washington, D.C. Regarding the night that they returned from the trip, defendant testified as follows:

> [Defense Counsel:] Did you touch [Adam] inappropriately that night?
>
> [Defendant:] No.
>
> [Defense Counsel:] Have you ever performed fellatio on [Adam?]
>
> [Defendant:] To my knowledge, no.
>
> [Defense Counsel:] And when you say "to my knowledge," what do you mean?
>
> [Defendant:] Because I -- I mean, once I'm

asleep, I'm asleep, and I don't recall doing anything to [Adam] while I was asleep.

[Defense Counsel:] Did you ever attempt to penetrate him or penetrate him anally?

[Defendant:] No.

[Defense Counsel:] Did you ever touch him inappropriately?

[Defendant:] [Adam] had a rash on him, so I applied cream, because he didn't want his mom to do it. So, if that's inappropriate, I did do that; but otherwise, no, I didn't.

Defendant described Adam's rash as flea bites on his penis.

Defendant denied showing Adam pornographic material, but admitted that he owned "a couple of pornographic CDs" and "was not aware that [Adam] watched any pornographic material at my house." Defendant conceded that Adam had told him about seeing pornographic material on defendant's laptop, but denied putting the pornographic video on his laptop. Defendant testified that when Adam asked him about the video, defendant said, "I have no clue, maybe somebody before you left it up there[.]"

Defendant testified that Adam stopped living with him in September of 2010 after defendant was arrested for selling pills to an undercover police officer in August 2010. Defendant became aware of the allegations of sexual abuse against him after he received a text message from Adam's mother. He sent

Adam's mother a text message in response asking why she was accusing him when she "didn't even try to get my side of the story." Defendant testified that his mention of having regret in a text message sent to Adam's mother was in reference to "selling pills and I knew that I had three months to sit in jail."

On 12 July 2013, the State dismissed the crime against nature charge and the contributing to the delinquency of a minor charge. On 12 July 2013, a jury found defendant guilty of the remaining charges. The trial court found defendant to be a prior record level II. On 12 July 2013, defendant was sentenced to terms of 276 to 341 months and 190 to 225 months for each count of statutory sexual offense, to be served consecutively, and to terms of 19 to 23 months for each count of indecent liberties with a child, also to be served consecutively.

From these judgment, defendant appeals.

## II. Standard of Review

> In criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is specifically and distinctly contended to amount to plain error.

N.C. R. App. P. Rule 10(a)(4) (2013). The North Carolina Supreme Court "has elected to review unpreserved issues for plain error when they involve either (1) errors in the judge's instructions to the jury, or (2) rulings on the admissibility of evidence." *State v. Hoskins*, __ N.C. App. __, __, 736 S.E.2d 631, 633 (2013) (citation omitted).

> [T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a "*fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done[.]"

*State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (citation omitted) (emphasis in original). "Under the plain error rule, [a] defendant must convince this Court not only that there was error, but that absent the error, the jury probably would have reached a different result." *Hoskins*, __ N.C. App. at __, 736 S.E.2d at 633 (citing *State v. Jordan*, 333 N.C. 431, 440, 426 S.E.2d 692, 697 (1993)).

## III. Discussion

Defendant argues that the trial court erred by (A) admitting testimony from four of the State's witnesses that amounted to vouching for Adam's credibility; (B) allowing a lay witness to testify that Adam had symptoms of PTSD; (C) admitting

evidence regarding defendant's possession of pornography; and (D) giving limiting instructions that were inadequate to protect defendant's right to a fair trial.

## A.   Witnesses and Credibility

In his first argument, defendant challenges portions of testimony from four of the State's witnesses – Nancy Berson, Dr. Molly Berkoff, David Rademacher, and Adam's mother.  Defendant contends that their testimony constituted improper vouching for Adam's credibility.  Because defendant did not object to the admission of the challenged testimony at trial, we conduct plain error review.

Defendant relies on *State v. Towe*, 366 N.C. 56, 732 S.E.2d 564 (2012), for the contention that an expert witness may not vouch for the credibility of the victim.  In *Towe*, a doctor, admitted as an expert in the field of pediatrics and child sexual abuse, observed normal results after a physical examination of the alleged victim of sexual abuse.  The doctor further testified that "[t]he lack of any findings would not be inconsistent with sexual abuse" and, that the victim fell into a category of "70 to 75 percent of the children who have been sexually abused [and] have no abnormal findings, meaning that the [physical] exams are either completely normal or very non-

specific findings, such as redness." *Id.* at 59-60, 732 S.E.2d at 566. The Supreme Court noted that

> [i]n a sexual offense prosecution involving a child victim, the trial court should not admit expert opinion that sexual abuse has *in fact* occurred because, absent physical evidence supporting a diagnosis of sexual abuse, such testimony is an impermissible opinion regarding the victim's credibility. . . . However, if a proper foundation has been laid, an expert may testify about the characteristics of sexually abused children and whether an alleged victim exhibits such characteristics.

*Id.* at 61-62, 732 S.E.2d at 567-68 (citing *State v. Stancil*, 355 N.C. 266, 266-67, 559 S.E.2d 788, 789 (2002)) (emphasis in original). Because the doctor observed no injuries during the victim's physical examination, "the only bases for [the doctor's] conclusory assertion that the victim had been sexually abused" were the victim's history as relayed by the victim's mother and the victim's statements made to a clinical social worker that were observed by the doctor. *Id.* at 62, 732 S.E.2d at 568. The *Towe* Court held that the challenged testimony was improper and that because the case turned on the credibility of the victim, "who provided the only direct evidence against [the] defendant," the error amounted to plain error. *Id.* at 63, 732 S.E.2d at 568.

Defendant also cites to several other cases which stand for the same principles as set out in *Towe*, that an expert witness may not opine that sexual abuse has in fact occurred, absent physical evidence supporting such a diagnosis. *See State v. Delsanto*, 172 N.C. App. 42, 44-45, 615 S.E.2d 870, 872 (2005) (a physician's testimony that "although she did not observe any physical manifestations of sexual abuse, the examination was 'absolutely consistent'" with the alleged victim's assertion that the defendant touched her genital area amounted to an impermissible opinion of the alleged victim's credibility and amounted to plain error)*; State v. Bush*, 164 N.C. App. 254, 259, 595 S.E.2d 715, 718-19 (2004) (where the alleged victim's credibility was questionable, a physician's diagnosis that the alleged victim had been sexually abused by the defendant, absent physical evidence of sexual abuse, added "tremendous credibility" to the allegations of abuse and amounted to plain error); and *State v. Couser*, 163 N.C. App. 727, 594 S.E.2d 420 (2004) (where a doctor testified that the results of a physical examination of the victim were not specific to sexual abuse, but that the diagnosis was probable sexual abuse by the defendant, our Court found this was an impermissible opinion about the victim's credibility and amounted to plain error).

Defendant attempts to analogize portions of Nancy Berson, Dr. Molly Berkoff, David Rademacher, and Adam's mother's testimonies to the aforementioned cases, arguing that although "the State's witnesses did not say outright that they believed that [Adam] was telling the truth, . . . their testimony reveals their assumption that he was in fact abused." However, after thorough review, we do not find his arguments persuasive.

We will first examine the testimonies of Nancy Berson and Dr. Molly Berkoff. The State tendered Berson as an expert witness in the evaluation and treatment of childhood trauma, with an emphasis in childhood sexual abuse. Berson testified that she met Adam and his family in April of 2011 to conduct a child medical evaluation as requested by the Department of Social Services. Counsel for the State asked Berson to describe the typical anxieties of children who were known victims of sexual abuse. Berson went on to testify that Adam's reluctance to disclose the alleged sexual abuse to his parents and his concerns that the disclosure would cause discord in the family and be hurtful to defendant were consistent with patterns of disclosure of known victims of childhood sexual abuse. Berson also testified that Adam's mannerisms during the interview where he disclosed the alleged abuse were "consistent with disclosures

and mannerisms of known victims of childhood sexual abuse[.]" Berson described Adam as having "an attitude of bravado that he was okay" and that it was "very confusing" for Adam to keep the alleged abuse a secret.

Dr. Berkoff was preferred as an expert in child sexual abuse pediatrics. Dr. Berkoff met with Adam on 13 April 2011 in order to complete a medical evaluation and to determine optimal treatment. Dr. Berkoff testified that she met with Adam's parents and that it was important that Adam's mother "had reported being supportive of [Adam's] disclosure and [had] provided immediate protection and [had] not allow[ed] [Adam] to have ongoing contact with [defendant.]" Dr. Berkoff explained how Adam's reaction of being "very worried" about and declining anal swabs was "consistent with known victims of sexual abuse." Furthermore, Dr. Berkoff testified as follows:

> [State:] Dr. Berkoff, in your experience and training and knowledge of known victims of sexual abuse, and known male victims of sexual abuse, is [Adam's] medical findings consistent with known victims of sexual abuse, and with the history that was provided?
>
> [Dr. Berkoff:] Yes.

We believe that the challenged portions of Berson and Dr. Berkoff's expert testimonies are distinguishable from the

circumstances present in *Towe, Delsanto, Bush, and Couser*, and do not constitute improper vouching. Rather, the facts of the present case are controlled by the law set out in *State v. Kennedy*, 320 N.C. 20, 357 S.E.2d 359 (1987). In *Kennedy*, the North Carolina Supreme Court held that it was not improper to allow two expert witnesses "to testify concerning the symptoms and characteristics of sexually abused children and to state their opinions that the symptoms exhibited by the victim were consistent with sexual or physical abuse." *Id.* at 31-32, 357 S.E.2d at 366. "The testimony of both of these witnesses, if believed, could help the jury understand the behavior patterns of sexually abused children and assist it in assessing the credibility of the victim." *Id.* at 32, 357 S.E.2d at 366. It is well established that "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion[.]" N.C. Gen. Stat. § 8C-1, Rule 702(a) (2013). "Other states have addressed this issue and held that testimony by qualified experts about characteristics typically observed in sexually abused children, such as secrecy, helplessness, delayed

reporting, initial denial, depression, extreme fear, nightmares with assaultive content, poor relationships and school performance, is properly admissible under similar evidence statutes." *Kennedy*, 320 N.C. at 32, 357 S.E.2d at 366. "The fact that this evidence *may* support the credibility of the victim does not alone render it inadmissible. Most testimony, expert or otherwise, tends to support the credibility of some witness." *Id.* at 32, 357 S.E.2d at 367 (emphasis added). Therefore, we hold that it was not error, much less plain error, for the trial court to admit testimony from Berson and Dr. Berkoff because "it is permissible for an expert to testify that a child exhibits 'characteristics [consistent with] abused children.'" *State v. Ewell*, 168 N.C. App. 98, 103, 606 S.E.2d 914, 918 (2005) (citation omitted).

Next, we examine the challenged testimonies of David Rademacher and Adam's mother, neither of whom were tendered as expert witnesses. Rademacher testified that he was a psychological associate and counselor working in Chatham and Orange counties. In August of 2011, Adam was referred to Rademacher for therapy. Rademacher testified that Adam "had symptoms of post-traumatic stress disorder. He told me about being sexually abused for some time; and he had symptoms such as

nightmares, day flashbacks, paranoia, fear of the dark, fear of being alone, he had some social anxiety that were . . . the immediate symptoms." Rademacher had seen significant improvement through Adam's therapy and because Adam did not have "nightmares very often anymore" and "doesn't have day flashbacks much anymore," Adam had "worked more on the other psychological issues secondary to sexual abuse, such as, you know, self[-]image, worrying about his own sexuality, things like that. Fear that he would hurt somebody someday, things like this." Rademacher testified that these were "normal concerns" and "very typical" in similar cases. In reference to Rademacher's testimony, the trial court gave a limiting instruction to the jury that stated as follows:

> You are not to consider any evidence of post-traumatic stress disorder as evidence of whether or not the offenses charged in this case actually occurred, but, rather you can receive and consider that evidence solely for two purposes.

> One purpose is to corroborate testimony of witnesses that you have previously heard testify in this case; and the second reason is to explain, if you so find, conduct or behavior of the alleged victim, . . . while he was in the care and being observed by [Rademacher].

After reviewing the record, we hold that Rademacher's testimony did not constitute vouching for Adam's credibility.

At no point in Rademacher's testimony did he testify regarding the merits of Adam's alleged sexual abuse. Assuming *arguendo* that it was error for the trial court to admit Rademacher's testimony, we hold that it does not amount to plain error based on the trial court's limiting instruction given to the jury, which we assume the jurors followed, that it not consider the challenged testimony as evidence of whether or not the offenses charged in this case actually occurred. *See State v. Glover*, 77 N.C. App. 418, 421, 335 S.E.2d 86, 88 (1985) ("[O]ur legal system through trial by jury operates on the assumption that a jury is composed of men and women of sufficient intelligence to comply with the court's instructions and they are presumed to have done so.").

Adam's mother, a lay witness, testified to the following:

> [State:] Tell me a little bit about [Adam] and his character for truthfulness.
>
> [Adam's mother:] I've tried to raise him . . . . -- I'm not this real religious person, but . . . I have faith; . . . And I told him, when you walk in truth, that it does not get any better than that. . . .
>
> [State:] And is he truthful?
>
> [Adam's mother:] Except when I go to GameStop and he said this game's only going to cost $15, and then $35 later, yeah, that's the biggest thing.

We disagree with defendant that the testimony of Adam's mother was equivalent to improper vouching. Pursuant to Rule 608(a) of the North Carolina Rules of Evidence, "[t]he credibility of a witness may be attacked or supported by evidence in the form of reputation or opinion" so long as the evidence refers "only to character for truthfulness or untruthfulness" and only after "the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise." N.C. Gen. Stat. § 8C-1, Rule 608(a) (2013). Moreover, assuming *arguendo* that this portion of testimony was inadmissible, defendant has failed to show a reasonable possibility that the jury would have reached a different result absent the alleged error. *See* N.C. Gen. Stat. § 15A-1443 (2013) (stating that "[a] defendant is prejudiced by errors relating to rights arising other than under the Constitution of the United States when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises"). Based on the preceding reasons, we overrule defendant's arguments that the State's four witnesses improperly vouched for defendant's credibility.

B.   PTSD

Defendant's next argument, which we review for plain error, is that the trial court erred by allowing Rademacher, a lay witness, to testify that Adam displayed symptoms of post-traumatic stress disorder. Defendant, relying on *State v. Hall*, 330 N.C. 808, 412 S.E.2d 883 (1992), argues that only an expert in the field may testify on the profiles of sexually abused children and "whether a particular complainant has symptoms or characteristics consistent with this profile." *Hall*, 330 N.C. at 818, 412 S.E.2d at 888.

Assuming without deciding that it was error for the trial court to admit this evidence since Rademacher was not tendered as an expert witness who had particularized training or experience related to post-traumatic stress disorder, defendant has not shown that it amounted to prejudicial error. Rademacher's testimony that Adam displayed symptoms was not admitted as substantive evidence that the alleged sexual abuse had in fact occurred. Furthermore, the trial court's limiting instruction to the jury regarding the application of evidence of post-traumatic stress disorder was sufficient to cure any possible prejudice to defendant resulting from its admission. Accordingly, defendant's arguments fail.

C.    Defendant's Possession of Pornography

In his third argument, defendant asserts that the trial court erred by admitting evidence regarding defendant's possession of pornography. Defendant did not object to the admission of this testimony at trial and, therefore, we conduct plain error review.

Defendant relies on our holding in *State v. Smith*, 152 N.C. App. 514, 568 S.E.2d 289 (2002). In *Smith*, our Court noted that

> [T]he *only* evidence that [the] defendant attempted to expose [the victim] to pornographic materials was [the victim's] testimony that [the] defendant once asked her to watch a video but would not tell her what the video was about. [The victim] then speculated that she *thought* the video was a pornographic movie.

*Id.* at 522, 568 S.E.2d at 294 (emphasis in original). Our Court stated that evidence of the defendant's possession of pornographic materials, without any evidence that the defendant viewed the pornographic materials with the victim or any evidence that the defendant asked the victim to look at pornographic materials, was not relevant to proving defendant committed the alleged offenses of taking indecent liberties with a child and first degree sex offense with a female child under the age of 13. *Id.* at 523, 568 S.E.2d at 295. Nevertheless, our Court held that the error was not prejudicial in light of other evidence presented at trial – the victim's testimony; the

victim's mother's testimony that the victim's statements to her concerning the alleged offenses were consistent with the victim's testimony at trial; a psychiatrist's testimony that the victim's statements made to her concerning the alleged sexual abuse were consistent with the victim's statements at trial; and evidence that the defendant had made sexually graphic and suggestive comments about the victim to two of his co-workers. *Id.* at 523-24, 568 S.E.2d at 295.

In the case *sub judice*, Adam testified that he found a video on defendant's phone of defendant masturbating. Defendant thereafter told Adam, "you better not look at my phone again." Adam also testified that he opened defendant's laptop in the car, while defendant was driving, and saw a pornographic picture of two men engaging in sexual intercourse. Adam asked, "what is this" and defendant replied "I don't know, just one of my friends probably been looking at that." Adam also found pornographic videos in defendant's apartment while defendant was away at work and testified that he watched them because he "was bored." Defendant requested a limiting instruction regarding the introduction of this evidence. The trial court stated that this evidence was relevant to the contributing to the delinquency of a minor charge and that there was sufficient

evidence from which a reasonable jury could find that pornography was shown or made available to Adam. The trial court declined to give a limiting instruction, instead allowing the parties to argue the implications of the evidence or lack thereof in closing arguments. Subsequently, the State dismissed the charge of contributing to the delinquency of a minor.

Similar to our reasoning in *Smith*, we hold that the admission of evidence regarding defendant's possession of pornography did not rise to the level of prejudicial error. The State presented Adam's testimony of the history of sexual abuse by defendant. Hawkins testified that defendant reported to her that he had had an inappropriate, sexual relationship with Adam. Detective Christie testified that Adam's testimony at trial was consistent with the details he provided in interviews with him in 2011 and 2012. Berson and Dr. Berkoff also provided expert testimony that Adam's mannerisms during an interview, patterns of disclosure, anxieties, and reactions to a medical examination were consistent with known victims of childhood sexual abuse. In light of the foregoing evidence, we hold that defendant has failed to establish a reasonable possibility that the jury would have reached a different result.

## D. Limiting Instructions

In his last argument, defendant contends that the trial court's limiting instructions were inadequate to protect his right to a fair trial. Defendant argues that he faced a "barrage of inadmissible evidence" which includes the following: the State's witnesses vouching for the victim's credibility; allegations that the victim had suffered psychological problems attributed to defendant's alleged abuse; and a suggestion that defendant's possession of pornography made it more likely that defendant abused victim. However, because defendant did not object to the form of the limiting instructions at trial and because he does not specifically and distinctly allege plain error on appeal, we dismiss his argument. *See* N.C. R. App. P. 10(a)(4) (2013); *see also State v. Davis*, 202 N.C. App. 490, 497, 688 S.E.2d 829, 834 (2010) (stating that "because [D]efendant did not 'specifically and distinctly' allege plain error as required by [N.C. R. App. P. 10(a)(4)], [D]efendant is not entitled to plain error review of this issue").

## IV. Conclusion

Based on the foregoing, we conclude that defendant received a fair trial, free of prejudicial error.

No prejudicial error.

Judges STEPHENS and STROUD concur.

Report per Rule 30(e).